**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| HAARSLEV, INC., | ) | |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION** |
| | ) | |
| v. | ) | **No. 23-2569-KHV** |
| | ) | |
| TOM'S METAL ENTERPRISES, LLC | ) | |
| d/b/a INDUSTRIAL METAL | ) | |
| ENTERPRISES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| HAARSLEV, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No. 23-2575-KHV** |
| | ) | |
| CHRISTENSEN MACHINE, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| HAARSLEV, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No. 24-2003-KHV** |
| | ) | |
| MICHAEL CHAPPLE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on Defendant Tom's Metal Enterprises, LLC's Motion

For Summary Judgment (Doc. #129) filed April 4, 2025.  Tom's Metal Enterprises ("IME") asks

the Court to enter summary judgment in its favor on each of plaintiff's five claims against it:

(1) breach of contract; (2) civil conspiracy; (3) fraudulent misrepresentation; (4) tortious

interference with contracts; and (5) unjust enrichment.[1]  Having carefully reviewed the record, the

Court finds that said motion should be sustained in part and overruled in part.

## I.    Count I: Breach Of Contract

According to the Pretrial Order (Doc. #119) filed April 1, 2025, plaintiff claims that (a) it

and IME entered into a fixed-price written contract, Purchase Order No. 17003 in the amount of

$800,000, pursuant to which IME was to manufacture screw conveyors for the Demkota Project;

(b) IME issued invoices to plaintiff that improperly included additional sums for items not related

to the production of the screw conveyors, including improper payments to Jeff Muir; (c) sufficient

consideration supported the contract; and (d) while plaintiff fully performed, IME breached the

contract by exceeding the purchase price of $800,000.  On Count I, plaintiff seeks to recover

$841,844.10 in overbilling, including $128,000 in unauthorized and undisclosed fees which IME

charged then paid to Muir and/or his company.

IME seeks summary judgment, arguing that plaintiff has insufficient evidence that it and

IME had a meeting of the minds that Purchase Order No. 17003 was a fixed-price contract that

IME would perform for $800,000.  Specifically, IME argues that (a) plaintiff cannot prove the

alleged contract or that IME breached it by charging more than $800,000; (b) plaintiff cannot prove

that IME breached Purchase Order No. 17003 by hiring and paying Muir as an independent

contractor; (c) no reasonable factfinder would conclude that IME agreed to a fixed price contract

---

[1]      To expedite a ruling on this motion, because the case is set for trial on November 10, 2025, the Court is communicating the reasons for its decision without attempting to draft a legal treatise or cite volumes of well established but relevant case law.  The law in this area is clear and the Court has taken into account the authorities which are cited in the parties' briefs, along with other authorities.  If necessary for future proceedings, the Court may supplement this order with additional findings of fact or legal citations.

when the contract did not define the scope of work, IME had proposed a time and materials contract for the as-of-yet undefined work and IME did not have the information and necessary drawings to estimate a fixed price.

The Court agrees and finds that IME is entitled to summary judgment on the issue whether Purchase Order No. 17003 constituted a binding contract for a fixed price of $800,000. From Purchase Order No. 17003, it is impossible to discern the scope of work which the parties allegedly intended, so the record is not clear whether that work was completed or paid, and when (if ever) IME began to perform additional work at plaintiff's request. The record is apparently undisputed that IME billed all work on a time and materials basis, including payments to Muir, and that plaintiff paid all such bills without objection. Neither IME nor plaintiff has sought summary judgment on the course of performance under which IME performed this work and plaintiff paid for it, so the Court does not address the terms of the parties' engagement with one another—except to say that Purchase Order No. 17003 did not reflect a meeting of the minds on an enforceable contract for a fixed price of $800,000.

## II.    Count II: Civil Conspiracy

The Pretrial Order alleges that (a) IME participated in a civil conspiracy with Chapple; (b) the object of the conspiracy was to defraud plaintiff so one or more of them would gain financially; (c) IME, Muir and Chapple had a meeting of the minds at their in-person meeting on March 22, 2022 on the methods and means to orchestrate the overbilling; (d) to accomplish the conspiracy, IME increased the dollar amount of its invoices to plaintiff by 10 per cent, failed to disclose the markup in itemized invoices to plaintiff, paid the money which it received to Muir even though IME did not employ him and he did not provide value for the money which he received, and breached its contract, Purchase Order No. 17003, by exceeding the purchase price;

and (5) IME's acts damaged plaintiff.  As damages, plaintiff seeks $841,844.10 in overbilling,

including $128,000 in unauthorized and undisclosed fees which IME charged to plaintiff then paid

to Muir and/or his company; and reputational damages in an amount to be determined by the jury

at trial.

Under Kansas law, the elements of civil conspiracy are (a) two or more persons; (b) an

object to be accomplished; (c) a meeting of the minds on the object of the conspiracy; (d) one or

more unlawful overt acts; and (e) damages as a proximate result of the conspiracy.  Stoldt v. City

of Toronto, 234 Kan. 957, 967, 678 P.2d 153, 161 (1984); Brinker v. McCaslin, 63 Kan. App. 2d

724, 738, 538 P.3d 1101, 1112 (2023).

IME seeks summary judgment, arguing that (a) plaintiff  has no evidence of one or more

unlawful overt acts, since it was not unlawful to hire Muir as an independent project manager for

IME, pay him for work performed or allow IME to receive payment for invoices on a time and

materials basis for work which was actually performed; (b) neither IME nor Chapple benefited

financially from payments to Muir, and Chapple's knowledge and approval of the payments is

imputed to plaintiff; (c) IME had no reason to believe that Chapple's approval of its invoices did

not include approval of payments to Muir; and (d) plaintiff was not harmed by the hiring and

payments to Muir.

In response, plaintiff argues that (a) Chapple, Muir and IME met on March 22, 2022; (b) the

outcome of that meeting was a $800,000 price quote from IME to plaintiff and an undisclosed

agreement whereby IME would inflate its prices by 10 per cent and pay that amount to Muir;

(c) the object of the conspiracy was to direct plaintiff's funds to IME and Muir; (d) the unlawful

overt acts were to send unapproved invoices in excess of the contract price and in violation of

Chapple's obligations to plaintiff; and (e) plaintiff was damaged because it paid in excess of $841,844.10, which was driven in part by the 10 per cent price increases to Muir.

Here, the record presents genuine issues of material fact whether IME conspired with Chapple and Muir to overcharge plaintiff and pay those funds to Muir and/or Chapple for their personal financial gain in violation of the interests of plaintiff. The record does not reflect that Chapple received anything of value for his role in the conspiracy, other than to benefit his so-called "friend," and evidence of his motive for participating in the alleged conspiracy seems to be quite thin. The Court's job does not include weighing that evidence, however, and it holds that plaintiff has stated actionable damage claims for civil conspiracy as they relate to plaintiff's damage claim for overbilling unauthorized fees for Muir. This holding assumes that plaintiff can establish "overbilling" according to some measure other than a fixed price contract of $800,000. As noted below, the Court does not address the terms of the parties' agreement, except to say that they did not have a fixed price contract for $800,000, so it is unclear what billing would have been proper.

Plaintiff has submitted no evidence of reputational damage and IME is entitled to summary judgment on that issue. IME's motion for summary judgment on Count II is otherwise overruled.

## III.    Count III: Fraudulent Representation

Count III alleges fraudulent misrepresentation by IME. Specifically, it alleges that (a) IME made false statements of material fact by increasing the dollar amounts of invoices related to Purchase Order No. 17003 by 10 per cent, failing to disclose the 10 per cent markup on its invoices to plaintiff, submitting wrongfully inflated invoices, which resulted in overpayments on Purchase Order No. 17003, calculating payments as time and materials while working under fixed price Purchase Order No. 17003, paying money from plaintiff to Muir, despite the fact that IME did not employ him and he did not provide value for the money received, and issuing invoices which

exceeded the value of Purchase Order No. 17003, and the labor and materials provided by IME, on the Demkota Project; (b) IME knew the invoices were false and contained false statements because it received Purchase Order No. 17003, which was a fixed price contract, and inflated invoices were billed pursuant to that purchase order; (c) IME intentionally issued the invoices for the purpose of having them paid by plaintiff; (d) the invoices were not calculated utilizing the limitation of the $800,000 total pursuant the purchase order; (e) plaintiff reasonably relied on the invoices and paid them; (f) plaintiff sustained damages by relying on the invoices which IME submitted.  By way of damages, plaintiff seeks $841,844.10 in overbilling, including $128,000 in unauthorized and undisclosed fees which IME charged to plaintiff then paid to Muir and/or his company.

Many of these claims do not involve representations of fact or failures to disclose facts.  As to affirmative misrepresentations, however, plaintiff alleges that IME made false statements by increasing the dollar amount of each invoice, representing that it was entitled to inflated amounts and calculating payments as time and materials while working under a fixed price contract.  Plaintiff also alleges fraud by omission, *i.e.* that IME invoices failed to disclose (a) the 10 per cent markup for Muir or (b) the fact that in total, the invoices exceeded the contract limitation of $800,000 pursuant to Purchase Order No. 17003.  As the Court has noted elsewhere, the claims involving Purchase Order No. 17003 must fail because they proceed from a premise which the Court has rejected: that Purchase Order No. 17003 represented an enforceable contract for a fixed price of $800,000.  Under the theories advanced by plaintiff, this holding disposes of all claims that IME engaged in affirmative misrepresentations or fraudulent omissions.

Under Kansas law, fraud can occur through either fraudulent misrepresentation (affirmative falsehoods) or omission (concealment or nondisclosure).  See State v. Valdiviezo-

Martinez, 313 Kan. 614, 626 (fraud often occurs through concealment rather than misstatement). The elements and circumstances under which liability arises differ slightly, especially with respect to when a party has a duty to speak. To establish a claim for fraudulent misrepresentation, plaintiff must prove the following elements: (a) defendant made an untrue statement of fact; (b) defendant knew the statement was untrue; (c) defendant made the statement with the intent to deceive or with reckless disregard for the truth; (d) plaintiff justifiably relied on the statement; and (e) plaintiff suffered damages. Paper, Allied, Chem. & Energy Workers Int'l Union, Local 5-508 v. Slurry Explosive Corp., 107 F. Supp. 2d 1311, 1328 (D. Kan. 2000); see Gerhardt v. Harris, 261 Kan. 1007, 1013, 934 P.2d 976, 981 (1997).

On the other hand, to succeed on a claim for fraudulent omission or fraud by silence, plaintiff must establish that (a) defendant had knowledge of material facts that plaintiff did not have and could not have discovered by the exercise of reasonable diligence; (b) defendant was under a duty to communicate the material facts to plaintiff; (c) defendant intentionally failed to disclose the facts to plaintiff; (d) plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (e) plaintiff suffered damages as a result of defendant's failure to communicate the facts to plaintiff. Stechschulte v. Jennings, 297 Kan. 2, 21, 298 P.3d 1083, 1097 (2013). Under Kansas law, a duty to disclose generally arises in these key situations: the parties are in a fiduciary or confidential relationship; one party places trust and confidence in another (e.g., employer-employee, attorney-client); or disclosure of material facts is required. Also, if one party has exclusive access to material facts and knows the other party is operating under a misapprehension, the duty to disclose may arise. See Zhu v. Countrywide Realty, Co., 165 F. Supp. 2d 1181, 1202 (D. Kan. 2001) (duty to disclose arises when one party has superior knowledge or knowledge that other party cannot reasonably obtain or when parties in fiduciary

relationship); DuShane v. Union Nat. Bank, 223 Kan. 755, 760, 576 P.2d 674, 679 (1978) (duty to disclose may arise where disparity of bargaining power or expertise or fiduciary relationship). Here, plaintiff has not demonstrated a genuine issue of material fact regarding fraud by omission: the record contains no evidence which suggests that defendant had a duty to disclose the 10 per cent markup or that its invoices exceeded $800,000. Plaintiff and IME were not in a fiduciary or confidential relationship and IME did not have exclusive access to material facts.

IME seeks summary judgment because (a) by submitting invoices which did not reflect payments to Muir but rather described parts worked on and percentages completed and did not separate labor and materials for each part, IME did not make false representations to plaintiff; (b) IME had records which reflected payments to Muir, but plaintiff did not ask for them until after the project was completed; (c) plaintiff had knowledge through Chapple that IME was paying Muir for his services as a percentage of the invoices; (d) other employees of plaintiff knew that Muir was involved; and (e) plaintiff was only damaged to the extent that it had a fixed price contract, which it did not have. Plaintiff's only response is that (1) IME made a factual assertion that the price of its fabrication services was $800,000, which was untrue; and (2) plaintiff relied on that assertion that the contract price was $800,000 and was damaged by an overpayment of $841,844.10. Again, these arguments are foreclosed by the fact that as a matter of law, the parties did not have an enforceable fixed-price contract for $800,000.

IME is therefore entitled to summary judgment on Count IV.

## IV.    Count IV: Tortious Interference With Contracts

Plaintiff claims tortious interference with contract, as follows: (a) plaintiff entered into two contracts with New Angus, LLC on the Demkota project (Purchase Orders #45680 and #53988) and a contract with FPL Foods, LLC on the FPL project (Purchase Order #16825); (b) IME's

actions of inflating the invoices to plaintiff by 10 per cent and six per cent, respectively, and exceeding the price under Purchase Order No. 17003 caused the breach of plaintiff's contracts with Demkota and FPL; (c) plaintiff had to rectify the breach of its contract with those customers at its own expense; (d) IME's conduct was intentional; (e) IME's conduct lacked justification; and (f) plaintiff was thereby damaged in its business reputation, in reduced profit on the FPL project and in having to provide a partial refund on the Demkota project. By way of damages, plaintiff seeks $858,312.43 in refunds that it had to pay New Angus on the Demkota project; and reputational damages in an amount to be determined by the jury at trial.

Under Kansas law, the elements of tortious interference with a contract are "(1) the contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) damages resulting therefrom." Cohen v. Battaglia, 296 Kan. 542, 546, 293 P.3d 752, 755 (2013).

IME seeks summary judgment, arguing that (a) IME did not interfere with plaintiff's contract for the Demkota project because plaintiff entered into a fixed price contract with New Angus and underestimated the cost of the project from the beginning; and (b) any loss or damage which plaintiff incurred on the Demkota project was caused by its own mismanagement and under-bidding. Plaintiff disagrees, arguing that (a) it had a contract with New Angus; (b) IME knew of that contract and entered into a related contract for parts to be fabricated for Demkota; (c) IME invoices were $841,844.10 greater than the $800,000 contract price on Purchase Order No. 17003; and (d) IME intentionally interfered with plaintiff's contract by upcharging its invoices by 10 per cent to pay Muir.

As noted elsewhere, plaintiff's argument that IME caused it to breach its contract with New Angus on the Demkota project is based on the false premise that it had a fixed price contract for

$800,000—a premise which the Court has resolved against plaintiff as a matter of law. Accordingly, plaintiff has no actionable claim that IME caused plaintiff to breach its contract by paying IME more than $800,000.    Troels Svendsen, plaintiff's president and corporate representative under Rule 30(b)(6), Fed. R. Civ. P., testified that IME did not cause plaintiff to breach its contract with Demkota and that actually, plaintiff did *not* breach that contract.  Aside from Purchase Order No. 17003, plaintiff cites no other theory on how it breached its contract with New Angus on the Demkota project, or how IME caused such a breach.  IME is therefore entitled to summary judgment on this issue.

Plaintiff does not allege that IME otherwise interfered with the contract between plaintiff and New Angus, and Kansas courts have consistently held that interference that does not result in a breach of the contract does not sustain a claim for tortious interference with an existing contract; the tort is focused on wrongful conduct that causes a third party to breach a legally binding agreement and is thus distinct from tortious interference with a prospective business advantage or expectancy, which does not require an actual breach—only the loss of a probable future economic benefit.  See Turner v. Halliburton Co., 240 Kan. 1, 12, 722 P.2d 1106, 1116 (1986).

Absent a breach of contract by plaintiff on the New Angus contract, plaintiff cannot prevail on the theory that IME induced plaintiff to breach that contract.  IME is therefore entitled to summary judgment on Count IV.

## V.    Count V: Unjust Enrichment

The Pretrial Order alleges that (a) plaintiff conferred a benefit on IME by paying its invoices; (b) IME appreciated or had knowledge that plaintiff was conferring that benefit; (c) IME overbilled plaintiff in the amount of $841,844.10; (d) IME retained the benefit of the overpayment; and (e) under the circumstances, it is inequitable for IME to retain the benefit of the overpayment.

IME contends that it is entitled to summary judgment because (a) it billed on a time and materials basis for its work on the project, it billed a reasonable amount, it did not bill for work not performed and plaintiff had no problem with the quality or timeliness of its work; (b) Muir's work benefitted plaintiff by ensuring that the project was performed in a timely manner; and (c) IME was not unjustly enriched by payments on a time and material basis, or for project management expenses to Muir.  Plaintiff's sole response to this argument is the meritless argument that the contract was for a fixed price for $800,000, and it was unjust for IME to retain $841,844.10 in overpayments.  As noted, however, no such contract existed.  Consequently, for this reason, IME is entitled to summary judgment on Count V.

Furthermore, under Kansas law, the equitable doctrine of unjust enrichment can only be invoked in a contract case in limited circumstances, specifically, when no enforceable express contract governs the same subject matter.  See Midwest Asphalt Coating, Inc. v. Chelsea Plaza Homes, Inc., 45 Kan. App. 2d 119, 123 (recovery for payment under terms of contract and recovery for quantum meruit are mutually exclusive legal concepts); In re Estate of Ramsey, 2020 Kan. App. Unpub. LEXIS 430, *17 (unjust enrichment not available to parties to contract since their respective rights and obligations are governed by contract).  Here, plaintiff does not claim that the parties lacked a valid contract—it just takes a legally unfounded position about the terms of the contact and whether it overpaid for what it received.  Unjust enrichment may be pled in the alternative to a breach of contract claim, but it cannot prevail if a valid and enforceable contract governs the issue.  See Swimwear Sol., Inc. v. Orlando Bathing Suit, LLC, 309 F. Supp. 3d 1022, 1039 (D. Kan. 2018) (Kansas law does not allow unjust enrichment claims where contractual remedies available; plaintiff cannot rely on unjust enrichment claim when binding and enforceable contract existed).

As noted, plaintiff did not plead unjust enrichment as an alternative to its contract claim in case its contract interpretation did not prevail.  It does not claim that the parties lacked an express contract or that the parties' contract was unenforceable (*e.g.*, void for illegality, unconscionability or lack of mutual assent, or that their contract was rescinded or is otherwise inapplicable to the benefit conferred)—scenarios in which the Court might allow quasi-contractual damages based on the value of the benefit conferred and retained unjustly.  Furthermore, plaintiff has not presented evidence that the amount charged by IME on a time and material basis was unreasonable or unjustly retained relative to the work which it provided.  Again, plaintiff's only position is simply that Purchase Order No. 17003 was a binding contract and because plaintiff is wrong about that, all claims which emanate from that position must fail.

IME is therefore entitled to summary judgment on Count VI.

## VI.     Section 84-2-606 Of The Uniform Commercial Code

As IME's affirmative defense to plaintiff's overpayment claims, the Pretrial Order alleges that plaintiff has waived its claims under Section 84-2-606 of the Uniform Commercial Code in Kansas, K.S.A. § 84-2-606.  Specifically, IME argues that even after plaintiff ordered and paid $800,000 for an unspecified number of screw conveyors, it continued to request additional items which plaintiff accepted and did not reject.

Section 84-2-606, entitled "What constitutes acceptance of goods," provides as follows:

(1)     Acceptance of goods occurs when the buyer
  (a)     after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or
  (b)     fails to make an effective rejection (subsection (1) of section 84-2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

   (c)  does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

 (2)  Acceptance of a part of any commercial unit is acceptance of that entire unit.

Section 84-2-606 does not address the waiver of claims, but once goods are accepted, the buyer generally becomes obligated to pay the purchase price under K.S.A. § 84-2-607(1), unless the buyer properly revokes acceptance or has other valid defenses. Sections 84-2-607(2) and (3), also stipulate that acceptance does not bar a breach of contract or warranty claim, but the buyer must notify the seller of the breach within a reasonable time after discovery, or the claim is barred.

On this record, it appears that plaintiff accepted goods which IME supplied and never gave notice that any of them were non-conforming, and in fact, successfully incorporated them into the Demkota project. Under Kansas law, however, acceptance of goods under K.S.A. § 84-2-606, does not constitute a general waiver of all breach of contract claims. For example, acceptance does not automatically waive a buyer's right to challenge the price charged under the contract, particularly if the challenge relates to a discrepancy between the agreed price and the invoiced price, an overcharge or a breach of express or implied terms related to pricing. Accordingly, plaintiff can claim the right to litigate over price discrepancies, improper billing or other pricing disputes if they arise from a breach. See K.S.A. § 84-2-607 (acceptance limits rejection rights, but not right to damages; buyer must give notice of breach within a reasonable time after he discovers or should have discovered breach); K.S.A. § 84-2-717 (buyer may deduct damages from the price, provided notice is given).

The parties have not addressed the UCC issues in this case on any kind of adequate basis. Plaintiff does not expressly argue that it retains rights to litigate the price of goods despite having

accepted them and failing to give notice of rejection.  On the other hand, IME's barren citation of

Section 84-2-606 does not squarely address its claim of waiver.

Aside from Purchase Order No. 17003, none of the parties have sought summary judgment

on the terms under which the parties did business.[2]  Therefore the Court does not address this issue

except to note that course of performance over repeated occasions will be a critical issue at trial.[3]

Plaintiff argues that under the UCC, the course of performance is only admissible to explain or

---

[2]      In IME's reply brief, it argues that summary judgment is appropriate because even
if Purchase Order No. 17003 was a fixed price contract, plaintiff altered the contract through its
course of performance by paying IME on a time and material basis for work on the project.
Although this claim has probable merit, the Court does not directly address it because IME raised
it for the first time in its reply brief and plaintiff has not had an opportunity to respond.

[3]      As an aside, the Court notes that under Kansas law, even if Purchase Order
No. 17003 had constituted a valid contract, a contract may be modified by course of performance
when the parties' conduct clearly and mutually reflects a modification of the original agreement—
even in the absence of a new written agreement.  Additionally, under certain circumstances, a
course of performance can establish the existence or terms of a contract, particularly in the context
of ongoing business relationships or under the UCC for the sale of goods.  Kansas recognizes that
a contract may be formed or modified by the conduct of the parties, especially when that conduct
is consistent, mutual and clear.  See Hutton Contracting Co. v. City of Coffeyville, 487 F.3d 772,
788 (10th Cir. 2007) (parties' intent to modify contract can be implied from conduct if they do not
continue to act according to contract's original terms).

Under Article 2 of the Kansas UCC, course of performance can interpret existing contracts
for the sale of goods, modify contract terms through the parties' repeated conduct, supply missing
terms in the absence of a fully integrated written agreement, and occasionally demonstrate the
existence of a contract, particularly where no written contract exists.  Section 84-1-303 defines
course of performance, course of dealing, and usage of trade as methods for interpreting and
supplementing contract terms.  Under K.S.A. § 84-1-303(a), a course of performance is "a
sequence of conduct between the parties to a particular transaction that exists if: (1) The agreement
of the parties with respect to the transaction involves repeated occasions for performance by a
party; and (2) the other party, with knowledge of the nature of the performance and opportunity
for objection to it, accepts the performance or acquiesces in it without objection."  K.S.A. § 84-1-
303(a).  The parties' course of performance or course of dealing "is relevant in ascertaining the
meaning of the parties' agreement, may give particular meaning to specific terms of the agreement,
and may supplement or qualify the terms of the agreement."  K.S.A. § 84-1-303(d).

supplement the terms of a written contract, and that Section 2-202 does not endorse course of performance as a means of amending or waiving express terms of written contracts. Plaintiff is incorrect and other than Purchase Order No. 17003, plaintiff does not claim that any written contract governs the relationship between it and IME.

On this record, the Court declines to find as a matter of law that under Section 84-2-606 of the Kansas Uniform Commercial Code, plaintiff has waived its rights to litigate the alleged overpayments to IME.

## VII.    Chapple's Authority

IME seeks summary judgment on the theory that Chapple was an agent of plaintiff and that because he had real or apparent authority in its dealings with IME, his approvals of IME billing were binding on plaintiff.  IME argues that even if Chapple lacked actual authority, it had no reason to know that he lacked authority, and plaintiff is therefore bound by Chapple's agreement that IME bill on a time and material basis and pay Muir as an independent project manager as part of those invoices.  Plaintiff responds that if IME was conspiring against plaintiff, plaintiff is not bound.

Under Kansas law, apparent authority arises when the principal's conduct or words lead a third party to reasonably believe that the agent has authority.  Carver v. Farmers & Bankers Broadcasting Corp., 162 Kan. 663, 671, 179 P.2d 195, 201 (1947).  If apparent authority arises, the principal is bound by the acts of the agent that are within the apparent scope of the authority conferred.  Id.  The principal is not bound, however, by the agent's acts that are outside the agent's apparent authority, and the third party must exercise ordinary prudence to ascertain the agent's authority.  Id. at 667, 179 P.2d at 199; Bohart v. Oberne, 36 Kan. 284, 284, 13 P. 388, 392 (1887) (third party bound at its peril to know extent of agent's authority).  It rationally follows that when a third party is colluding with an agent to engage in conduct adverse to the principal—such as

through unauthorized payments—the principal's words or conduct do not create apparent authority for the agent's actions, and the agent is acting outside the scope of his apparent authority.  The third party (here, IME) cannot reasonably believe that the agent has authority for such actions and therefore cannot rely on apparent authority.  See Lowrance v. Fleming Cos., No. 65,078, 1991 WL 12018797, at *7 (Kan. Ct. App. Feb. 1, 1991) (apparent authority exists only to extent third party reasonably believes agent is authorized; if third party has reason to believe agent is violating principal's orders, he cannot subject principal to liability).

Here, plaintiff claims collusion between IME, Chapple and Muir, and the Court has held that IME is not entitled to summary judgment on the conspiracy claim,  For purposes of this motion, plaintiff has demonstrated a genuine issue of material fact whether Chapple was acting outside the scope of his authority, and by virtue of the alleged conspiracy, IME cannot rely on Chapple's apparent authority in his dealings with IME and his approvals of IME billings.

IME's motion for summary judgment on this issue is overruled.

**IT IS THEREFORE ORDERED** that Defendant Tom's Metal Enterprises, LLC's Motion For Summary Judgment (Doc. #129) filed April 4, 2025 be and hereby is **SUSTAINED as to Count I (breach of contract); Count II (claim for reputational damages on account of conspiracy); Count III (fraudulent misrepresentation); Count IV (tortious interference with contract); and Count V (unjust enrichment).  IME's motion is OVERRULED as to Count II (civil conspiracy); plaintiff's alleged waiver of rights to overpayment under the Uniform Commercial Code; and Chapple's apparent authority.**

Dated this 2nd day of June, 2025 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL

United States District Judge